## Strawn Farmers' Elevator Company, Appellee, v. Albert S. West, trading as John West and Company, Appellant.

### Gen. No. 19,807.

1. PRINCIPAL AND AGENT, § 100*—*authority of manager of grain elevator company to engage in speculative deals in grain.* A contract of employment of a manager of a grain elevator company, construed as not giving the manager authority to bind the company by engaging in speculative deals in grain on any grain exchange.

2. PRINCIPAL AND AGENT, § 185*—*when evidence insufficient to show ratification of speculative transactions of agent.* Evidence *held* insufficient to show that a grain elevator company ratified the acts of its manager or was estopped to deny he exceeded his authority in making speculative deals in grain in the name of the company on the Board of Trade, it appearing that the officers of the company had no knowledge of the speculative transactions and no reason to suspect them, that the company received no benefit therefrom, and that the manager was discharged as soon as they were discovered.

Appeal from the Municipal Court of Chicago; the Hon. OSCAR M. TORRISON, Judge, presiding. Heard in this court at the October term, 1913. Affirmed. Opinion filed October 13, 1914.

CHARLES A. BUTLER, for appellant; FRANKLIN RABER, of counsel.

NORTON & ORTMAN and THOMAS J. LAWLESS, for appellee; KRAUS, ALSCHULER & HOLDEN, of counsel.

MR. PRESIDING JUSTICE BROWN delivered the opinion of the court.

The Strawn Farmers' Elevator Company, a corporation of this State, doing business at Strawn in this State, as plaintiff, obtained in a case of the first class on July 16, 1913, a judgment in the Municipal Court of Chicago against Albert S. West, doing business under the name of John West and Company, in Chicago,

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

for $1,563.19. The judgment was in a cause tried by the Municipal Court without a jury. From this judgment Albert S. West has appealed to this court.

The Strawn Elevator Company was a corporation which a written agreement (in evidence) between it and one John W. Jordan, its employee as "manager" from April 11, 1907, to February 20, 1909, recites to have been incorporated "for the purpose of buying, storing and selling grain in the Village of Strawn, Illinois."

Albert West (as John West and Company), was a dealer in grain on commission and otherwise in Chicago and a member of the Chicago Board of Trade.

It is not disputed (it is indeed stipulated) that from May, 1907, to February 3, 1909, the Strawn Farmers' Elevator Company, through Jordan as manager, consigned to John West and Company grain to be sold on commission by that concern; that it was so sold and that the proceeds of those shipments over all the proper charges of John West and Company and amounts already paid the Strawn Company by John West and Company were $1,563.19.

This grain so shipped by and sold for the account of the Strawn Farmers' Elevator Company was purchased by that Company from the farmers in the country tributary to Strawn, which is a small town of three or four hundred people. The transactions in these shipments of grain between May 13, 1907, and February 4, 1909, on which this amount of $1,563.19 remained unpaid, amounted to almost $70,000.

The defense against this evident prima facie liability of the appellant is that these shipments and sales were not all the transactions between the Strawn Farmers' Elevator Company and John West and Company which should be taken into account in this suit. The defendant West maintains that in another series of transactions through orders for purchases and sales for future delivery on the Chicago Board of Trade,

which, so far as the parties on the board were concerned, were afterwards settled and accounted for without delivery—"speculative deals," that is—the Strawn Farmers' Elevator Company acting through its manager, Jordan, became indebted to John West and Company (the defendant) between the two dates above mentioned in the sum of $1,597.25, thus wiping out what would otherwise have been the indebtedness of John West and Company to the Strawn Company.

The answer to this on the part of the Strawn Company is a denial on its part that any such alleged purchases or sales were made by, for, or on its account or with the knowledge or consent of it or its officers. It admits and stipulates that during this period J. W. Jordan, then manager of the Strawn Farmers' Elevator Company, gave the orders in question to John West and Company, and that said orders were transmitted by said Jordan in the name of said Strawn Farmers' Elevator Company by telegraph to the office of John West and Company, and that said John West and Company properly executed them with the pecuniary results alleged; but it asserts that said transactions were not authorized by the Strawn Company expressly or impliedly; that they were not ratified or accepted or even known by the Strawn Company, and that it cannot be held liable for them, they being the individual speculations of Jordan, for the results of which he alone was liable; and that immediately upon the Strawn Company learning that Jordan had been giving such orders in its name he was discharged from their employment.

To this the defendant West rejoins that Jordan had authority to make said speculative purchases and sales for future delivery, or at least was held out by the Strawn Company as its manager in such a way that it cannot deny said authority; and, moreover, that its officers and directors received constructive notice by the course of dealings and communications herein-

after referred to, of the carrying on by Jordan in its name of such speculative transactions, and not then objecting to them must be now held to have ratified them or at least to be estopped from repudiating them. The Strawn Company replies that Jordan had no such authority; that it never ratified any of said transactions, and never had any notice, actual or constructive, of them until after the last one mentioned, when it promptly discharged Jordan; and that there is no estoppel or presumed authority to be deduced from the evidence.

Although it is stipulated that the defendant West had no actual notice of the terms of the contract of employment between the Strawn Company and Jordan, it is evident that the starting point of an inquiry like the one in this cause is the actual authority given by the contract of employment of the agent whose actions are in question.

The present contract was in writing and has been construed as to the authority it gives by the Appellate Court of the Second District in a suit in which the Supreme Court refused a certiorari, making the decision of the Appellate Court final. *Strawn Farmers' Elevator Co. v. James E. Bennett & Co.,* 168 Ill. App. 428.

The statement of this case may be therefore more satisfactory if we give the document in full:

"This agreement made this 11th day of April, A. D. 1907, between John W. Jordan of the Village of Wapella, Illinois, party of the first part, and the Strawn Farmers' Elevator Company, a corporation, duly incorporated under the laws of the State of Illinois, for the purpose of buying, storing and selling grain in the Village of Strawn, Illinois.

"Witnesseth: That the party of the first part covenants and agrees upon the performance of the covenants hereinafter mentioned as made by the party of the second part, to take charge of the elevator belonging to said party of the second part, in the capacity of

manager for said second party, to conduct all business connected therewith in the way of buying grain and storing and disposing of the same, to fix prices paid for grain, to hire and pay out of his own money all employees necessary to the handling of said grain, to superintend the loading of the same on cars, to draw bills of lading, to receive and pay out all moneys and make all contracts necessary in the regular transactions in said business of buying, selling and storing grain, to draw drafts and issue checks in the name of said corporation, to keep such itemized books of account showing all business transacted as is customary with grain dealers, to keep, and to attend to the insuring of all grain belonging to said corporation also buildings and machinery.

"Said party of the first part further covenants and agrees to give a penal bond in the sum of Five Thousand Dollars with good and sufficient sureties to be approved by the party of the second part, conditioned for his faithful performance of his duties as such manager.

"The party of the second part hereby covenants and agrees with the party of the first part to furnish an elevator in good working condition, to furnish an engine and suitable machinery for operating the same, to provide all necessary repairs on said building and machinery and install the same, to furnish all gasoline necessary for running said engine, to pay all insurance provided on buildings, machinery and grain, to furnish office furniture, books and supplies for carrying on said grain business, to furnish all moneys to carry on said grain business and to pay the said first party a salary of One Hundred Dollars for each and every month in which he shall be so employed as manager for said corporation.

"Said second party further covenants and agrees to assume all losses resulting from fire, from the act of God, from any deterioration of grain handled, from any decrease in price, from losses occurring during transmission of grain between shipping point and destination, from robbery and from all other losses in connection with the business of the corporation, not

directly resulting from violation of this agreement by said first party, and hereby exempts said first party from all liability for such losses.

"This agreement to continue in full force and effect until terminated by either party, which may be done by giving thirty days notice in writing to the other, which notice shall be given on or before the seventeenth day of the month.

JOHN W. JORDAN,

Party of the first part.

STRAWN FARMERS' ELEVATOR COMPANY,

By EDWARD LYNCH, Pres.

T. J. O'CONNOR, Sec.,

Party of the second part."

This agreement might almost suggest that although the corporation was not in form a co-operative arrangement, it was actually intended to be much that kind of an undertaking; that is, to furnish marketing facilities for the grain actually raised by its incorporators. But however that may be, there is, in our opinion, nothing in it which gives or implies power in the manager to engage his corporate employer in any speculative deals in grain upon any grain exchange whatever; and that it did not is, in effect, specifically decided in *Strawn Farmers' Elevator Co. v. James E. Bennett & Co., supra,* in which case similar speculative dealings with and through another party by Jordan in the name of the Strawn Company were held not to bind the Company.

It being thus established that the mere fact that the manager, Jordan, sent these speculative orders to be executed on the Chicago Board of Trade in the name of the Strawn Company did not bind that Company, and that such dealing did not come within the general scope of Jordan's employment or authority, and consequently that in the absence of some matter affecting the situation other than that Jordan was the manager of the Strawn Company, West dealt with him in these speculative transactions at his peril,

and must look to him alone for reimbursement,—the question in this case is reduced to whether there is any such matter which implied ratification by, or estoppel on, the plaintiff in regard to these transactions.

The trial judge below decided there was not, as a matter of fact or of law, and we think he was right.

The appellant's contention, however, is that there are at least four such matters:

*First.* He maintains that the prompt communication by mail addressed to the Strawn Company of the execution of these orders by accounts of sales, and the monthly statements also sent by West & Company to that address, raises a presumption that the proper officers of the Company had notice of the transactions, and by silence acquiesced in them, which presumption is not overcome by any positive evidence that the officers did not see these documents. As to this it is sufficient to say that it does appear that Jordan alone received all these communications, and there is certainly no evidence that any officer ever saw one of them, while Jordan's statement is that they did not "so far as he knew."

*Second.* The appellant says that the evidence shows that West & Company had similar dealings with the Strawn Company—ten or fifteen in number—before Jordan became the manager, which shows that such transactions were a part of its usual business, and that the manager must be supposed to have had authority to conduct them.

But we cannot see how the conclusion arises from the premises. As the Appellate Court of the Second District said in the *Bennett* case, *supra*: "The question presented by this record is not the scope of appellee's authority to deal in grain, but the scope of Jordan's authority to bind it in such transactions."

Nor do we think that the testimony of West relied on very definitely proves even the premises. The

testimony of Poole of a conversation with Lynch, an officer of the Strawn Company, tending to show a statement of Lynch that the Company had made speculative trades on the Chicago exchange, was directly contradicted by Lynch.

*Third.* The appellant insists that profits on the speculative transactions on the Board of Trade were to the amount of several hundred dollars sent by West & Company to the Strawn Company and were credited in the books of the Strawn Company, which books were audited by a committee of the officers and directors of the Company; that the Strawn Company should therefore be held to have had notice of the transactions, and that having received and acquiesced in the benefit of the fortunate ones, it cannot repudiate and escape liability for those in which there were losses.

If the evidence showed that the auditing committee or the officers of the Company had actual notice of the fact that profits arising from transactions like these in controversy were being credited to the Company in its books and received the benefit of them, and said nothing, the argument would be a good one. But the evidence taken together does not tend to show this; it only shows, taking it to the utmost extent that it makes for the appellant, a certain carelessness in auditing which failed to detect that there were two or three credit entries not exactly corresponding to those which the shipments of grain would call for. But according to the evidence for the plaintiff the records of the Board of Trade transactions were kept in a private book of Jordan's, not among the plaintiff's books. There was no actual knowledge among the officers of Jordan's speculations in the name of the Company or otherwise, and no reason to suspect them. He was discharged as soon as those speculations were discovered. The Strawn Company, in this condition of things, was under no obligation to West

& Company requiring a careful audit of the books to discover if their agent was exceeding his authority. The dealings of West & Company were at their own peril. If there was an audit, but one not so thorough or searching as it might have been, which did not result in the discovery of Jordan's transactions, it is an immaterial matter in this controversy, and we think that is what the evidence in this case taken together shows.

The Strawn Company received no benefit from these speculative transactions which can estop it in this suit. Even on the theory of the appellant, amounts which came from the profits of these transactions were credited on the actual shipments of grain made, and reduced the amount for which this suit was brought and this judgment obtained.

*Fourth.* The delay in bringing this suit, after the speculative transactions of Jordan in the name of the Strawn Company had been discovered and Jordan discharged, amounted, it is argued, to a failure to repudiate, and therefore to an affirmance of the obligation on the Company for them.

The transactions ended in 1909, and the suit was not brought until 1913.

But we do not see how the mere lapse of time after the transactions were over, less than the time necessary to bar the action, could estop the plaintiff or affect its rights. It does not appear what, if any, communications passed between the parties during these four years.

The judgment of the Municipal Court is affirmed.

*Affirmed.*